

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
                                                )
BARBARA K. NIXON-TINKELMAN,   )
                                                )
            Plaintiff,                          )
                                                )   COMPLAINT
      -v-                                       )   (Jury Trial Requested)
                                                )
NEW YORK CITY DEPARTMENT  )
OF HEALTH AND MENTAL            )
HYGIENE and NEW YORK CITY    )
LAW DEPARTMENT                      )
                                                )
            Defendants.                         )
                                                )
------------------------------------------------X

Barbara K. Nixon-Tinkelman, by her attorneys Pedowitz & Meister, LLP, alleges as follows:

## NATURE OF ACTION

1.  This action is brought to remedy claims of disability discrimination and/or discrimination in retaliation for her assertion of rights under Section 504 of the Rehabiliatation Act (29 USC §794) to redress injury done to her by defendants' discriminatory treatment on the basis of her disability in violation of the Rehabilitation Act of 1973, as amended, 29 USC §§701, et. Seq.  In 1978, Congress amended the Rehabilitation Act of 1973, to provide that the "remedies, procedures and rights" under Title VI of the Civil Rights Act of 1964 should apply to cases brought under Section 504 of the Rehabilitation Act.  29 USC §794a(a)(2).

2.  Plaintiff seeks injunctive and declaratory relief, compensatory damages,

punitive damages, liquidated damages, back pay, front pay, benefits, attorneys fees and other appropriate relief pursuant to federal law.

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is invoked pursuant to 29 U.S.C. §§794 et. seq., 28 USC §1331, and 28 USC §1343(a)(4). This court has supplemental jurisdiction over Plaintiff's Human Rights Law and City Law claims.

4. As the unlawful employment practices complained of herein occurred, and Defendant regularly does business, within the Southern District of New York, venue is proper in this District pursuant to 28 U.S.C. Secs. 1391(b).

## THE PARTIES

5. Plaintiff, Barbara K. Nixon-Tinkelman ("Tinkelman") is a Caucasian female, 60 years of age, and a resident of Eastern Queens, New York. She has multiple disabilities and has been designated as a "Civil Service 55A, physically disabled person" since 1994. The initial designation was from serious childhood cardiac conditions and breathing (asthma) problems, which also led to hearing loss. Tinkelman has suffered additional disabilities since 1994, including but not limited to cancer and ischemic heart disease all of which has been documented to her employer, New York City Defendant Department of Health and Mental Hygiene. Tinkelman is a "handicapped individual" within the meaning of 29 USC 706(8).

6. Defendant, New York City Department of Health and Mental Hygiene ("DOHMH"), is an administrative agency of the City of New York. Its stated mission is

to "protect and promote the health of people in New York City." Defendant is a recipient of federal financial assistance within the meaining of the Rehabilitation Act and thus is covered by Section 704 of the Rehabilitation Act. The DOHMH is Plaintiff's employer and has had her assigned to work in Manhattan, NY since early 2007.

7.  Defendant New York City Law Department ("Law Department") is an administrative agency of the City of New York. It serves as counsel and advisor to the DOHMH. On information and belief Defendant is a recipient of federal financial assistance within the meaning of the Rehabilitation Act and thus is covered by Section 704 of the Rehabilitation Act.

8.  DOHMH employs approximately 6,000 people and approximately 48 DOHMH work locations throughout all five Boroughs. Staff is also deployed at non-DOHMH sites such as schools, shelters, probation and parole centers, and other areas of need. There are also several hundred "off site" locations throughout New York City.

9.  DOHMH employed Tinkelman for approximately 23 years. The majority of her employment has been in supervisory administration roles. Tinkelman's Civil Service title is Associate Staff Analyst and her office title is Regional Director.

10. On August 21, 2006, Tinkelman returned to her position at the Bureau of Oral Health Programs after a period of medical leave following hospitalization at North Shore University Hospital to treat a serious infection from trauma to her left hand.

11. On August 23, 2006 Tinkelman was directed to meet with Health Care Access and Improvement ("HCAI") Deputy Executive Director Employee/Labor

Relations and EEO, Michael Aragon ("Aragon"). At that time, Tinkelman was placed "on loan" from the DOHMH, Bureau of Oral Health Programs (OHP) to the Bureau of Transitional Health Care (THCC).

12. Aragon informed Tinkelman of her new job assignment, to "help (central office) THCC move and to answer the phones." THCC is a program that assists prisoners in New York City jails to transition more easily from incarceration to the public arena. There are two units within THCC, a jail-based and a community-based program. This assignment was inappropriate for Tinkelman given her disabilities, civil service title, education and experience.

13. This assignment was in direct contradiction to the activities Tinkelman was to avoid as per the Medical Disability Report and Individual Written Rehabilitation Program Report from the New York State Department Office of Vocational and Educational Services for Individuals with Disabilities ("VESID"), the organization that certifies 55A status.

14. The report specifically states that Tinkelman is to avoid dusty locations due to her asthma. It also states the Tinkelman is restricted in her abilities to "lift, carry, pull and push." The report also notes that Tinkelman has difficulties, "walking, standing, climbing stairs, squatting, and using her legs and arms." Tinkelman's job description as an Associate Staff Analyst had never included duties like those before.

15. Tinkelman's ability to fulfill her new assignment "to answer phones" was severely compromised because, despite numerous requests for a phone for the hearing

impaired, which she is, Tinkelman was never provided with one. In addition, Tinkelman was required to pack boxes that exposed her to dust, irritants and allergens.

16. Alison O. Jordan ("Jordan") is Director of the DOHMH, Bureau of Transitional Health Care and Coordination ("THCC") in the Division of Health Care Coordination and Improvement ("HCAI"). In the matter of a request for a reasonable accommodation, Tinkelman reports to Jordan. Jordan reports to Deputy Commissioner Cohen ("Cohen"), Cohen reports to Commissioner Thomas Freiden.

17. Finding that working conditions were having an adverse effect on her health, beginning in November 2006, Tinkelman emailed several memos to HCAI, Executive Director Aragon, with cc's to Jordan requesting that a reasonable accommodation be granted. The requests for a reasonable accommodation were denied.

18. On December 7, 2006, Tinkelman was given an assignment to clean, organize and take inventory of the storage closets at the DOHMH Brownsville Health Center. There were approximately 30 boxes to rearrange, many of them heavy boxes containing pamphlets that Tinkelman was incapable of lifting or moving. After several hours of organizing and taking inventory of this storage facility, Tinkelman developed difficulty breathing and had to leave the work site in order to go directly to her physician's office. Dr. Bellovin initially diagnosed Tinkelman as having an asthma attack, however her condition continued to deteriorate, leading to bronchitis. Tinkelman went out on sick leave for approximately two weeks.

19. With the completion of THCC's central office move, on January 16, 2007

Tinkelman was directed by Deputy Director of THCC, Sehu Jeppe ("Jeppe") to report to 225 Broadway, Floor 23, in Manhattan, beginning January 19 as her base of operations. This new location required Tinkelman to perform a three-hour round trip commute. Tinkelman's assignment also included one day per week in the field completing the inventory of storage rooms.

20.   Tinkelman had previously been based in Queens as a reasonable accommodation. Her reassignment was done without any consideration to her health needs.

21.   At 225 Broadway, Tinkelman was assigned to a desk in an unheated hallway on the 23rd floor. Tinkelman made numerous requests to Jordan to use a vacant desk in a heated room nearby. These requests were denied. Jordan told Tinkelman that once the doors to the offices were open, heat would filter out. Unfortunately, the doors to the offices closest to Tinkelman remained closed.

22.   During this assignment, Tinkelman developed a severe symptoms including shortness of breath, chronic cough, general malaise, fatigue and weakness. Tinkelman's cough was persistent and severe enough that staff at the Bronx field site complained to their union after Tinkelman had reported to perform inventory in the storeroom.

23.   On March 12, 2007 Tinkelman was admitted to Long Island Jewish Hospital with viral pneumonia. Treatment was complicated by pleural effusion, which led to the discovery of a previously undiagnosed heart attack. As a result of these illnesses, Tinkelman went out of work under the Family Medical Leave Act (FMLA).

24. Tinkelman, after consultations with her physicians, Bellovin (cardiologist), Patel (oncologist), and Martin (consultation-liaison psychiatrist), informed DOHMH that she planned to return to work on April 23, 2007.

25. Doctors Bellovin, Patel and Martin wrote letters requesting a reasonable accommodation under the Americans with Disability Act. They noted that Tinkelman's work in Manhattan was computer related, with minimal staff interactions, and in an unheated hallway. The trip took a minimum of three hours and involved climbing stairs, standing for unpredictable periods of time, walking and raising the arms above the shoulders (to hold on in subways).

26. Tinkelman's doctors requested in writing a reasonable accommodation under the American with Disabilities Act that would allow Tinkelman to work at a "DOHMH site closer to home." They specified that "an assignment in Queens would be invaluable-the patient has been physically stressed and somewhat debilitated" noting the need to "for the time being minimize the stress of traveling" with "no objections to traveling to NYC occasionally" however "the Manhattan location is inimical to her physical and psychological health" and added that "she would contribute most effectively were her working conditions satisfactory." These letters were mailed to DOHMH, Employee Health Services (EHS) and to HCAI Aragon prior to Tinkelman's "return to duty" appointment with EHS.

27. In order to return to duty, Tinkelman was required to be cleared through a medical evaluation at EHS. On April 18, 2007, Tinkelman kept her appointment at the

DOHMH Division of Employee Health, requesting a return to duty from her FMLA Leave. She, once again, submitted letters from her doctors, each of which requested a Reasonable Accommodation be granted by providing a location to complete her assignments closer to her home.

28. During this appointment, Dr. Gehl, Director of the DOHMH Employee Health Division, approved the request for a reasonable accommodation "pending bureau (THCC) approval." However, he then stated that "Alison Jordan (Director of THCC) will never approve the request because she thinks you (Tinkelman) are 'big trouble!'" He suggested Tinkelman call Jordan to discuss the matter.

29. Unable to return to work without a reasonable accommodation, Tinkelman returned home after her appointment on April 18, 2007 and called THCC Director Jordan. Jordan's suggestion was to "get a job somewhere else, transfer to another agency, if you want to be closer to home." Tinkelman, still "on loan" to THCC from Oral Health Programs, reminded Jordan that Tinkelman's old DOHMH, Oral Health Program's fully equipped office (with appropriate phone- which still has not been supplied at any THCC locations) on Queens Blvd remained vacant and available. The request for a reasonable accommodation continued to be denied.

30. Tinkelman immediately called Aragon to review the denied request. He said that he could not over-ride Jordan's denial of the reasonable accommodation request.

31. Without a reasonable accommodation, Tinkelman remained on FLMA leave. On April 24, 2007, Consultation-Liaison psychiatrist Martin, from Long Island

Jewish Hospital, wrote to Aragon, "Her illness was most serious... At this time, Ms. Tinkelman cannot return to work... Ms. Tinkelman has reported that for some reason her superiors at the Department of Health refuse to recognize her clinical needs and insist on putting her in harm's way in the form of a poor working environment. This is most puzzling, but it should be stated that they must take the consequences of any worsening of her condition because of this refusal to adjust her working conditions. This letter is written with considerable concern for her welfare and I hope you will take this information with the utmost seriousness."

32. On May 21, 2007 Tinkelman returned to work after again reporting to the DOHMH Division of Employee Health with letters from her physicians requesting that a reasonable accommodation continue to be considered.

33. On May 23, 2007, Tinkelman met with THCC Director Jordan, in her Manhattan office, to discuss the request for a reasonable accommodation. Jordan, once again, suggested that Tinkelman find a job in another Agency if she wanted to work closer to home, be closer to her doctors and the medical facilities that have experience with her condition. Jordan told Tinkelman to "get a transfer from the Union" because "that is what you pay dues for."

34. Tinkelman, once again, reminded Jordan, that her previous OHP Queens office was still available. (Tinkelman was still on loan from OHP to THCC). Jordan denied the request.

35. Tinkelman then suggested the Bronx Morrisania Health Center THCC field

site office as a possible site for a reasonable accommodation. Jordan improperly denied both reasonable accommodation sites.

36. Having returned from FMLA leave, and without a reasonable accommodation, Tinkelman resumed the schedule she had prior to going out on FMLA.

37. On May 24, 2007 Tinkelman reported to the Bronx Morrisania THCC office in order to complete the inventory in the storage closets as assigned. While at the Morrisania Health Center field office, Tinkelman was called "Jewish white trailer trash" by one of the THCC employees. Tinkelman reported the incident to Jordan who responded by reprimanding Tinkelman for being at the Bronx field site, despite Tinkelman being there as part of her assignment prior to FLMA which included one day per week of taking inventory of storage closets at field locations. According to Deputy Director Sehu Jeppe, Jordan directed Jeppe "to write (Tinkelman) up for insubordination," for being at the Bronx THCC field office.

38. On May 30, 2007 Tinkelman contacted Aragon who later told Jordan that she was not within her rights to write Tinkelman up for insubordination because Tinkelman was appropriately returning to her assignment as per prior to FLMA.

39. On June 6, 2007 Tinkelman emailed the DOHMH Office of EEO, EEO Officer Bailey, ("Bailey") a memo describing her medical conditions and that her numerous requests for a reasonable accommodation had been improperly denied. Tinkelman completed and submitted a formal DOHMH "Request for Reasonable Accommodation" form, with supporting documentation, to NYC, DOHMH, EEO.

40. On June 6, 2007 Tinkelman met with Claudio Crusco ("Crusco"), Social Worker with the NYC Employee Assistance Program (EAP). Crusco wrote a letter supporting Tinkelman's request for a reasonable accommodation. This letter was submitted to both Aragon and Baily.

41. On June 12, 2007 Tinkelman emailed Bailey a description of her situation. On June 15, 2007 Tinkelman had a meeting with Bailey to discuss her request for a reasonable accommodation.

42. On June 14, 2007, Tinkelman wrote a letter to her union, Organization of Staff Analysts, informing them of her formal DOHMH Request for a Reasonable Accommodation.

43. On June 21, 2007 Tinkelman met with Deputy Commissioner Cohen to discuss her formal DOHMH request for reasonable accommodation. Cohen suggested Tinkelman transfer to another agency and directed her to the Department of Aging website.

44. One June 21, 2007 Tinkelman was notified that the formal DOHMH request for a Reasonable Accommodation request was denied.

45. On July 9, 2007, at the suggestion of Organization of Staff Analysts Union attorney, Fausto Zapata, a second "DOH EEO Request for Reasonable Accommodation" form was submitted, with additional doctor letters to DOHMH EEO. This request reached the "Commissioner Appeal" level, the highest appeal level within the Agency.

46. The Commissioner's office forwarded the Commissioner's Appeal for a

Reasonable Accommodation back to Cohen.

47. Tinkelman was informed that a meeting with Cohen and Jordan was scheduled for July 16, 2007 at 9:30AM to discuss the Commissioner's Appeal.

48. On July 16, 2007 at 9:30AM Tinkelman reported to Cohen's office and was informed that the meeting had been rescheduled. Later that day Tinkelman returned from lunch to find a letter marked "confidential" on her chair in the hallway. The letter from Deputy Commissioner Cohen stated that Tinkelman was no longer "on loan" from OHP and that Tinkelman was permanently transferred to THCC. The letter then stated that the only THCC sites that would provide Tinkelman with a reasonable accommodation were the Riker's Island jail and the Queensborough Correctional Facility.

49. On August 1, 2007 a meeting was held at the 225 Broadway Board Room. THCC Director Jordan, THCC Deputy Director Jeppe, HCAI Executive Director Aragon, Tinkelman, OSA union attorney Fausto Zapata ("Zapata"), OSA Paralegal Satima were present. THCC Director Jordan informed the group that Tinkelman was now permanently assigned to THCC. Jordan stated that the only sites that would meet Tinkelman's requirements for a reasonable accommodation were the jails. Jordan then stated that, given Tinkelman's medical condition, the jails would not be suitable as they are stressful environments. Jordan's statement was not correct.

50. Jordan subsequently testified at her deposition in a parallel New York State action by Tinkelman, that at the time Tinkelman could have been assigned to work in its Brownsville office, a site that was considerably better for Plaintiff as the commute could

be done faster and more easily.

51. At the end of the meeting, Jordan concluded that, after 23 years with the Agency, Tinkelman had no alternative but to leave the Department of Health and Mental Hygiene and go to another agency. She then instructed Zapata to find Tinkelman another worksite.

52. Zapata then informed Jordan that the matter before the group was a formal Request for a Reasonable Accommodation under the Americans with Disability Act and DOHMH must resolve the matter, not the union.

53. Approximately ten minutes following the August 1, 2007 meeting to discuss Tinkelman's reasonable accommodation, Jordan emailed Tinkelman a memo stating that it was DOHMH policy to refrain from sending any personal Emails. Tinkelman was the only employee to have received this memo. The memo was retaliatory and discriminatory.

54. Tinkelman later learned through Aragon during a meeting with Zapata on August 29, 2007 that the "personal Emails" that Jordan was referring to were Tinkelman's communications expressing her requests for a Reasonable Accommodation to the EEO office and to the labor relation's office.

55. On August 14, 2007, in an attempt to find a reasonable accommodation, Tinkelman applied for numerous vacant positions with DOHMH.

56. On August 29, 2007 Zapata, Aragon and Tinkelman had a meeting to discuss the possibility of attaining a reasonable accommodation though the DOHMH

vacant positions. Aragon was presented with a list of all vacant positions to which Tinkelman had applied.

57. When Tinkelman filed the formal "DOHMH Request for Reasonable Accommodation," the DOHMH did not follow proper procedure. The policy states that the "employer must consider the applicants preferences" and that "when more than one possible reasonable accommodation exists, the employer should give primary consideration to the employee's preferences." Tinkelman's primary preference to return to her old office in Queens was denied. Her suggested alternate work location in the Bronx, which did not have any of the objections Jordan noted for the Queens site was also denied. Jordan's primary response in answer to Tinkelman's numerous requests for a reasonable accommodation was for her to find another job.

58. Tinkelman thereafter started an action in the New York County Supreme Court inter alia alleging disability discrimination under the New York State and New York City laws against discrimination (the "State Action").

59. The DOHMH is represented and advised by Defendant Law Department in the State Action.

60. During her deposition Jordan stated that the Brownsville office had room to house Plaintiff and that Plaintiff could work there as a reasonable accommodation. Plaintiff expressly told Jordan that she accepted the Brownsville office work site as a reasonable accommodation. This took place on March 5, 2008.

61. Despite Tinkelman's emphatic acceptance of the reasonable

accommodation the DOHMH has failed and refused to assign Tinkelman to the Brownsville location. On information and belief Defendant Law Department advised the DOHMH that regardless of the fact that a reasonable accommodation was required, whatever position the DOHMH took it would support the DOHMH.

62. In early May, 2008 there was a fire drill at Tinkelman's place of work. She could not hear the warning bell due to her impairment and she was therefore left alone in the office while everyone else evacuated. As a consequence of the foregoing Tinkelman feared for her life as the DOHMH whose mission is "protect and promote the health of people in New York City" demonstrated its lack of regard for Plaintiff.

63. Thereafter, Tinkelman collapsed to the ground at work on account of the impact that Defendants' refusal to abide by the law has had on her. Tinkelman was subsequently taken to the hospital for emergency medical intervention where she remains as of this date.

64. Tinkelman has lost leave time, sustained unpaid leave time, has had reduced payments to her pension, and has been denied salary increases and promotional opportunities by virtue of DOHMH's actions and failures to act.

65. Tinkelman is now plagued with Defendants refusal to grant her request for a Reasonable Accommodation under the Americans with Disability Act and from the Defendants retaliation against her for requesting the Reasonable Accommodation, and by Defendants' refusal to remove the barriers to Plaintiff's ability to work effectively.

66. By virtue of the foregoing Tinkelman sustained damages and was

discriminated and retaliated against in the terms and conditions of her employment on account of her having a disability and for having asserted her rights to be protected under the law and against unlawful conduct.

67. Tinkelman should be made whole for the damages she sustained, an injunction should enter requiring Defendants to desist from their unlawful actions, Tinkelman should be reassigned to a work location close to her home and to doing work consistent with her level of achievement, and punitive damages should be awarded against Defendants. Additionally, this court should declare the DOHMH and the Law Department no longer qualified to receive federal funding.

68. Tinkelman reserves the right to amend this complaint in the event that a notice of right to sue is issued by the EEOC in connection with the Charge she filed alleging a violation of the Americans With Disabilities Act.

69. Plaintiff is suffering and has continued to suffer irreparable injury for which she has no adequate remedy at law

70. In taking the above-described discriminatory and retaliatory actions, the Defendants acted with malice and reckless indifference to Tinkelman's rights under the Rehabilitation Act.

WHEREFORE, Tinkelman respectfully requests that this Court enter a Judgment in her favor and against Defendants as follows:

    a) Order Defendants to cease and desist from discriminating against Plaintiff on account of her disability; and

b) Directing Defendants to remove the barriers to her working and to allow her to work from a location either at her home or reasonably close to it; and

c) Enjoining Defendants from failing to respect the rights of those with disabilities; and

d) Directing that Defendants are disqualified from receipt of federal funding; and

e) Entering judgment in favor of Plaintiff for such back pay, pre-judgment interest, lost leave time, lost raises, and other fringe benefits as may be found by a jury;

f) entering judgment in favor of Plaintiff for compensatory damages and for punitive damages; and

g) Granting Plaintiff here costs, expenses and reasonable attorneys' fees as well as such other and further relief as this Court may deem just and proper.

Dated: New York, New York
May 14, 2008

                Yours, etc.

                PEDOWITZ & MEISTER, LLP

                ARNOLD H. PEDOWITZ (AP 1382)
                Attorneys for Plaintiff
                1501 Broadway, Suite 800
                New York, NY 10036
                (212) 403-7321